# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROL KEPHART | : |
| Plaintiff, | : |
| v. | : 3:16-CV-02452 |
| | : (Judge Mariani) |
| NEWELL FUEL SERVICE, INC. | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff Carol Kephart brings this employment discrimination action against her former employer, Newell Fuel Service, Inc. ("Newell Inc."), alleging that her employment was terminated on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). Doc. 1. Before the Court is Defendant's Motion for Summary Judgment. Doc. 17. For the reasons set forth below, the Court will deny Defendant's Motion.

### II. FACTUAL BACKGROUND

Defendant has submitted a Statement of Material Facts as to which it argues there is no genuine issue for trial. Doc. 17-2. Plaintiff has submitted an Answer to the Statement of facts and a Counter-Statement of Facts. Doc. 21. In its reply, Defendant included an Answer to Plaintiff's Counter-Statement of Facts. Doc. 23. Based on these documents and the record, the following facts are not reasonably in dispute unless otherwise noted.

Newell, Inc. is a small fuel oil business that sells and delivers fuel oil to residential and commercial customers. Doc. 17-2 ¶ 1. Its primary location is in Shavertown, Pennsylvania, but it opened a satellite office in Wapwallopen, Pennsylvania in 2006. *Id.* ¶¶ 1-2. In November 2006, Newell, Inc. hired Plaintiff Carol Kephart to work in the newly acquired satellite office. *Id.* ¶ 3. Kephart mainly worked as a customer service representative at the office. *Id.* ¶ 5. According to Kephart, her duties included "[a]nwering the phone, taking orders, printing tickets, any monies that came through the office, handling LIHEAP [Low-Income Home Energy Assistance Program] for people for heating season, dispatching the drivers, dealing with customers – walk-in customers on a daily basis, going over accounts receivable, calling people when they were late on their bill, [] – and a lot more too." Doc. 21-4 at 17.

The only other regular employee in the satellite office was Edward "Sam" Atkinson, who had been working for Newell, Inc. since 1990. Doc. 17-2 ¶¶ 7-8. The satellite office also employed a part-time driver named Joe Polofsky. *Id.* ¶ 9; *see also* Doc. 21-4 at 14 (Kephart testifying that only two truck drivers, Atkinson and Polofsky, and herself worked out of the satellite office); Doc. 21-5 (Russell Newell referring to Joe Polofsky as "a part-time driver that would come in occasionally"). During Kephart's employment, Atkinson acted as a delivery driver and the general manager of the satellite office. *Id.* ¶ 8. Though Kephart denies that Atkinson "functioned as a general manager" in her Response to the Statement of Facts (doc. 21 ¶ 8), that denial is belied by Kephart's own EEOC Complaint, which states:

2

"My manager would fill in if I had something planned but not often...Edward Atkinson, a Truck Driver for the company was also given title of Manager of the satellite office. However, he was not really the Manager. He was the one who put together routes for him and for one other Driver." Doc. 21-4 at 38 (Kephart did not expound further on why Atkinson "was not really the Manager" in her EEOC Complaint). In addition, both Atkinson and Russell Newell, the owner of Newell, Inc. testified that Atkinson managed the satellite office, despite the fact that he was never given the formal title "general manager." At Atkinson's deposition, he testified that he "moved up to [the satellite] office from the [main] office to be a manager/driver". Doc. 21-3 at 9. He also considered himself Plaintiff's "immediate supervisor." *Id.* at 36. Newell stated that he would consider Atkinson as the manager of the satellite office, though he did not have a formal job title. Doc. 21-5 at 18. Kephart and Atkinson often shared many of the same office responsibilities. *Id.* at 16-17; *see also* Doc. 21-3 at 9-10 (Atkinson testifying that he took over Kephart's responsibilities when she was sick or on vacation); Doc. 21-4 (Kephart testifying that when she was not at the office, it was primarily Atkinson who filled in for her job).

In February 2013, Atkinson was charged with a DUI offense, which was resolved with his acceptance into an ARD (Accelerated Rehabilitative Disposition) program in March 2014. Doc. 17-2 ¶¶ 10-11. As a result of his entry into the ARD program, Atkinson's commercial driving license was suspended for a year starting on May 13, 2014, thus rendering him unable to drive trucks or make deliveries for Newell, Inc. *Id.* ¶¶ 12-13. This is

Atkinson's second DUI during his employment at Newell, Inc. Doc. 21-3 at 6. Atkinson was not disciplined by Newell, Inc. as a result of his first DUI. Doc. 21 ¶ 29. After his second DUI, Atkinson and Newell discussed "finding something else for [him] to do while [his] driver's license was suspended." Doc. 21-3 at 28. They concluded that "the only option was [Atkinson] would dispatch and take over duties at the [satellite] office." *Id.* at 29. Atkinson understood that this decision would mean that Kephart "would be laid off with the ability to collect [unemployment benefits]." *Id.*

Kephart was laid off shortly thereafter on June 9, 2014. Doc. 17-2 ¶ 15. At his deposition, Russell Newell testified that he decided to let Kephart go because there was not enough work for two employees in the satellite office. Doc. 21-5 at 30-31 (Newell testifying that "[t]here there is no way [the satellite office] would survive. There is no room for two people in the office[,] it was so tiny, and we would have to close that office up there because without [*sic*] someone to run it. Sam [Atkinson] was the only one qualified that understood those things that were needed to run it, to manage it."). He also testified that he decided to keep Atkinson because he, unlike Kephart, knew how to plan routes for other drivers. *Id.* at 29 (Newell testifying that "[s]omeone had to do the degree days, schedule the deliveries, lay out the routes. It was a job [Kephart] didn't do."); *id.* at 13 (Newell testifying that Atkinson "has to set everything up. No one else knows up there what to do. No one but him could do the degree days, estimate when they're due, recording the weather and figuring that out. And then he sets up the route so that they only go in one direction at a time, preferably").

4

See also Doc. 21-3 at 10 (Atkinson testifying that as the "manager/driver" of the satellite office, he would "set up the routes" for other drivers).

When asked why he kept Atkinson as an employee over Kephart at deposition, Newell testified that he believed Atkinson "was the only one that could run that office," because he knew how to do route planning related work, and "[i]t takes a long time to learn it[; Atkinson] learned it years ago." Doc. 21-5 at 37. When asked if he ever offered Kephart "an opportunity to try to learn how to put together routes," Newell repeatedly answered that "[s]he could have learned it[, s]he was there long enough"; that "[s]he had all the opportunity in the world[, we] wish she would have"; and that "[s]he had an opportunity[, s]he was there all day" before finally admitting that he had never offered to teach Kephart route planning. *Id.* at 31-33. He testified that he did not "need to train her because somebody [i.e. Atkinson] was already doing that job." *Id.* at 33. When asked how he knew that Kephart did not know how to do route planning work, Newell was only able to answer (after protracted questioning) that he "can't explain it, she just didn't know." *Id.* at 35. When asked why he did not ask Atkinson to teach Kephart route planning, Newell said that if he had, the company "would have gone bankrupt and closed the office." *Id.* at 36-37.

Kephart, for her part, does not argue that she in fact knew how to plan routes or calculate degree days, which is an industry term for the measure of weather cooling or heating used in route planning. She admitted at deposition that her job did not "encompass setting up the daily schedule for [the] drivers…as far as what deliveries they had to make on

5

those routes"; she considered that to be Atkinson's job. Doc. 21-4 at 40-41. *See also* Doc. 21-4 at 38 (Kephart's EEOC Complaint stating that Atkinson "was the one who put together routes for him and for one other Driver. Also he printed out automatic customer tickets weekly using a degree day system").

According to Kephart, Newell informed her that she would be laid off because Atkinson was going to be working at the office full time. Doc. 21-4 at 48 ("He said that due to Sam [Atkinson] getting a DUI and losing his trucking license, that he's going to take over my job and that I would be losing my job."). Kephart's EEOC Complaint recounts her termination as follows:

> On June 9, 2014, Russell Newell Sr. came to the satellite office to tell me I would be laid off permanently (in other words, terminated) due to Edward Atkinson getting a DUI. He informed me that although he hated to do this, he didn't know what else to do. Edward Atkinson would be just about uninsurable to drive even when he got his license back. He told me I was not to come back the next day and that he would not dispute my unemployment and they would give me a letter of recommendation.

Doc. 21-4 at 39. Kephart did not present any evidence of gender-related remarks made to her or about her at the workplace. When she was asked about the basis for her sex discrimination suit, she responded: "[j]ust he – they gave [Atkinson] my job because they didn't believe that I could do it. And he's a male. It's sexual discrimination because he sat [*sic*] the – he would set the routes up and do degree days, and I believe that is definitely sexual discrimination." Doc. 21-4 at 54-55. Before her termination, Kephart had never filed any complaints to anyone at Newell Inc. about her working conditions. *Id.* at 42-43.

6

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, ...[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light

7

most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

Kephart has brought a Title VII claim and a PHRA claim against Newell, Inc. for gender discrimination. Because there are triable issues of fact from the record, including issues of witness credibility, summary judgment cannot be granted.

Title VII and the PHRA both prohibit discrimination by an employer against an individual on the basis of that individual's race, color, religion, sex, or national origin. 42

8

U.S.C. § 2000e-2(a); 43 P.S. § 955(a). "[T]he PHRA is construed consistently with interpretations of Title VII." *Eldridge v. Municipality of Norristown*, 514 F. App'x 187, 189 n.2 (3d Cir. 2013) (citing *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1083-84 (3d Cir. 1995)). To prevail on a claim for gender discrimination at summary judgment, the Plaintiff must satisfy the familiar three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). *See also Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) ("To prevail on a claim for gender discrimination under Title VII and its analogous provision under the PHRA, [plaintiff] must satisfy the three-step burden-shifting inquiry laid out in *McDonnell Douglas*.").

Under the framework, Plaintiff must first establish a *prima facie* case of gender discrimination, which requires a showing that: "(1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) members of the opposite sex were treated more favorably." *Burton*, 707 F.3d at 426 (citing *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir.2005)). "A plaintiff may also meet the last element by showing that the adverse employment action 'occurred under circumstances that could give rise to an inference of intentional discrimination.'" *Id.* (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir.2008)). Here, Defendant has conceded that Kephart, the only female employee in the satellite office, has established a

*prima facie* case. *See* Doc. 18 ("In the case at bar, and for purposes of the pending motion, Defendant concedes that plaintiff can state a *prima facie* case.").

In response to Plaintiff's *prima facie* showing, the burden shifts "to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Burton*, 707 F.3d at 426 (quoting *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir.2009)). "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

Here, Defendant has met this relatively light burden. According to Russell Newell, the decision to lay off Kephart was borne out of financial necessity and the overlap of employee responsibilities. Newell, Inc. is a small company that had approximately twenty employees in 2014. Doc. 21-5 at 55. During most of Kephart's employment at Newell, Inc., the satellite office only included Atkinson, Joe Polofsky, a part-time driver, and Kephart herself. Doc. 17-2 ¶ 9. At the time of her termination, Joe Polofsky had been laid off as well. Doc. 21-4 at 46 (Kephart testifying that as of June, 2014, Mr. Polofsky had been laid off, but that another driver had been working out of the office, though she did not specify whom). When Atkinson had his commercial driving license suspended, he began working primarily out of the office. Newell testified that he decided to terminate Ms. Kephart

10

because there was not enough work for two employees in the satellite office, and that there was "no way [the satellite office] would survive [otherwise]." Doc. 21-5 at 30-31. He further testified that Atkinson "was the only one qualified that understood those things that were needed to run it, to manage it," in part because Atkinson, unlike Kephart, knew how to plan routes for the drivers. *Id.* at 29-30. Newell testified that "[s]omeone had to do the degree days, schedule the deliveries, lay out the routes," and that "[i]t was a job [Kephart] didn't do." *Id. See also id.* at 13 (Newell testifying that "[n]o one but [Atkinson] could do the degree days, estimate when they're due, recording the weather and figuring that out. And then he sets up the route so that they only go in one direction at a time, preferably"). In addition, Atkinson testified that he was the "manager / driver" of the satellite office, and that he "set up the routes" for himself and other drivers. Doc. 21-3 at 10. Finally, Kephart's own EEOC Complaint states that Atkinson "was given title of Manager of the satellite office. However, he was not really the Manager. He was the one who put together routes for him and for one other Driver." Doc. 21-4 at 38. Though the EEOC Complaint claims that Atkinson "was not really the Manager," it does not give a reasonable basis for such an assertion. If anything, the Complaint confirms Newell and Atkinson's testimony that Atkinson did the route planning work. Thus, Newell, Inc. has stated a legitimate, non-discriminatory reason for the decision to keep Atkinson instead of Kephart as an employee in the satellite office, namely, that Atkinson had the necessary skills (i.e. route planning) for Newell, Inc.'s business, whereas Kephart did not.

11

Since the Defendant has stated a legitimate non-discriminatory reason for terminating Kephart's employment, "the burden of production [shifts] back to [Plaintiff] to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)). "The plaintiff must make this showing of pretext to defeat a motion for summary judgment." *Id.* (citing *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir.2008)). "To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 427 (quoting *Fuentes*, 32 F.3d at 764).

Plaintiff offers several arguments in support of her position that the stated reason for her termination was pretextual. First, she points to the fact that Atkinson considered "Plaintiff to be a 'secretary' when it was clear that she was doing much more than that...[a] reasonable jury could infer that Plaintiff was seen simply [as] a stereotypical 'woman' assigned to an expendable role in the office" Doc. 22 at 9. This argument is unpersuasive for several reasons. First, Atkinson's belief as to Plaintiff's role in the office is not relevant, as he was not the decisionmaker for the adverse employment action at issue, nor is there any evidence that he indirectly influenced Mr. Newell's decision to lay off Kephart in any way. Second, while calling a female employee "a secretary" may evince a generalized,

implicit bias about traditional gender roles, such evidence, without more, is not sufficient to constitute legally actionable evidence that Plaintiff suffered adverse consequences due to gender animus. Third, Plaintiff herself characterized her job title as "[s]ecretary/dispatcher" at her deposition. Doc. 21-4 at 13.

Plaintiff's other arguments of pretext include the fact that neither Newell nor Atkinson offered to teach Kephart how to perform route planning before she was laid off, and highlighting the ostensible unfairness of the fact that Atkinson was "actually rewarded when he was moved into Plaintiff's job" after his DUI conviction. Doc. 22 at 9. At deposition, Newell stated that he did not discipline Atkinson for the DUI because it occurred outside the scope of his work. Doc. 21-5 ("Well, he was not driving a truck and he was not on the job. I can't tell people that work for me what to do or when to do it. If [my employees] drink on their own, that's it, they're on their own...I would have to fire him for drinking in the truck or not passing a test."). As for teaching Kephart the aspects of route planning work, Atkinson was not asked—and thus he did not explain—why he did not teach Kephart route planning. Doc. 21-3 at 14. Newell, however, was repeatedly pressed on this subject at deposition. In fact, he was asked not once, but six times, whether he offered to train Kephart on route planning before he gave a responsive answer:

> Q. Did you ever offer Ms. Kephart an opportunity from the company to try to learn how to put together the routes?
> A. She could have learned it. She was there long enough.
> Q. That's not what asked you, sir, I asked you whether you ever offered her an opportunity to learn how to do it?

13

A. She had all the opportunity in the world. We wish she would have.

Q. Again, sir, I am going to ask the question again because I think it is pretty clear. Did you ever offer her an opportunity to do it?

A. I didn't verbally, but she had [the] opportunity.

Q. Did you ever say to her, learn how to do the routes today, we are going to train you how to do it?

[Objection by counsel]

A. She had an opportunity. She was there all day.

Q. So, sir, is what you are telling me that your testimony is that she could have learned it when she was there but she didn't?

A. Absolutely.

Q. And I understand that's your position, but my question is different. I am asking you whether you ever asked her or extended to her, you know, a formal training session to say, hey, we are going to sit you down and teach you how to do this part of the job today?

A. There was already somebody there doing that. It would take – it is not that easy to do that part of the job. It takes a long time to learn the degree days and to be able to massage down so that people don't run out of oil and so that they're not overfilled.

Q. Sir, again, I understand that. I understand your testimony is it is a complicated job. I am asking you did you ever extend, you know, a formal invitation to Ms. Kephart [to teach her route planning]?

A. No formal invitation.

Doc. 21-5 at 31-33. Later in the deposition, Newell claimed that Atkinson "can't sit there [and teach Kephart] when he has got work to do. He had to be out on the truck." *Id.* at 36. When counsel pointed out that at the relevant time, Atkinson was working exclusively in the office due to his license suspension, thus suggesting that Atkinson had the time in the office to train Kephart, Newell merely responded "[y]eah, we would have gone bankrupt and closed the office." *Id.* at 36-37.

14

Finally, Newell engaged in more protracted back-and-forth with counsel when he was asked how he knew that Kephart was incapable of doing route planning:

> Q. So, before you laid her off, you never inquired to see if she knew how to do that part of the job [i.e. route planning]?
> A. No, she didn't, she didn't know.
> Q. How do you know that?
> A. I know that she didn't.
> Q. Okay. How do you know that, that's what I'm asking?
> A. I know that she didn't.
> Q. Okay. Can you explain to me how you know that?
> A. I can't explain it, she just didn't know.

*Id.* at 35. Because the only evidence of the Defendant's non-discriminatory reason for the adverse employment action is from Newell's deposition testimony, and because the Court may not make an assessment of credibility in determining whether to grant summary judgment, Defendant's motion for summary judgment must be denied. The Court finds that there is sufficient evidence to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir.1992)).

In employment discrimination cases, it is well established that "[a]n inference of pretext may arise if the plaintiff can raise suspicions with respect to the defendant's credibility or the employer's treatment of the employee." *Bray v. Marriott Hotels*, 110 F.3d

15

986, 990 (3d Cir. 1997) (citing *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638–39 (3d Cir. 1993)). *See also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012) (finding that summary judgment was not appropriate in a retaliation case where "the only evidence showing [the supervisor] decided to fire Lichtenstein prior to going on leave is [supervisor's] own testimony," and the supervisor's testimony was inconsistent given that "[a]t least *twice* during her deposition [the supervisor] stated that she couldn't recall [when] she made the termination decision," and noting that these inconsistencies "go to the very core of [Defendant's] proffered reason for terminating Lichtenstein" and "[t]hey also 'raise suspicions' about [the supervisor] credibility"); *Burton*, 707 F.3d at 428 ("By crediting the testimony of the Teleflex employees and disregarding the Burtons' conflicting testimony, the District Court improperly made credibility determinations, which it may not do at summary judgment."); *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir.2011) (noting that at summary judgment ,"[t]he court may not ... weigh the evidence or make credibility determinations because these tasks are left for the fact finder") (internal quotation marks omitted).

Here, the testimony of Mr. Newell raises credibility issues that are best reserved for a jury. The record reveals that Atkinson was moved into an office position at the satellite office after he was convicted of a DUI and had his commercial driving license suspended, effectively supplanting Kephart's position. The only evidence of Defendant's reasons for doing so is from Mr. Newell's deposition testimony, whose credibility is for the jury to

16

determine. *See, e.g., Bray*, 110 F.3d at 990; *Lichtenstein*, 691 F.3d at 310. Given the lack of evidence as to any performance issues by Kephart (Doc. 21-5 at 34), a reasonable juror could conclude that the proffered reason for terminating Kephart's employment in favor of retaining Atkinson was a pretext for gender discrimination. In other words, Newell's deposition testimony has raised sufficient credibility concerns that a reasonable factfinder could infer that his stated reason for firing Kephart was a pretext. Accordingly, Plaintiff's Title VII and PHRA claims will not be dismissed.

In so ruling, the Court notes that the evidence of pretext in this case is marginally above the requisite level to survive summary judgment under *McDonnell Douglas*. The record appears to be relatively thin on evidence of gender discrimination besides the decision to lay off Plaintiff, who was one of the only two full-time employees at the satellite office. Kephart has not adduced other evidence of pretext such as remarks relating to gender made to her or about her in the workplace. She never filed complaints to anyone at Newell Inc. about her working conditions. Doc. 21-4 at 42-43. And when she was asked whether she had any evidence "[o]ther than the fact that they gave [her] office job to Mr. Atkinson because he could no longer do his driving job," Kephart could not point to any other evidence besides her termination, stating: "No, just he – they gave him my job because they didn't believe that I could do it. And he's a male. It's sexual discrimination because he sat [*sic*] the – he would set the routes up and do degree days, and I believe that is definitely sexual discrimination. They gave him my job." *Id.* at 54-55. However, because

17

there is an issue of fact as to Newell's credibility, summary judgment cannot be granted at this time.

## V. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied. Doc. 17. A separate Order will follow.

Robert D. Mariani
United States District Judge